# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1672

HABITAT EDUCATION CENTER, et al.,

*Plaintiffs-Appellants,*

*v.*

U.S. FOREST SERVICE, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-C-0578—**Lynn Adelman**, *Judge.*

ARGUED FEBRUARY 26, 2010—DECIDED JUNE 29, 2010

Before FLAUM and WOOD, *Circuit Judges*, and ST. EVE, *District Judge.**

FLAUM, *Circuit Judge*. Habitat Education Center appeals from a grant of summary judgment to the United States Forest Service in a lawsuit challenging the environ-

* The Honorable Amy J. St. Eve, District Judge for the Northern District of Illinois, sitting by designation.

mental impact statement ("EIS") prepared by the agency in connection with a forest management project in the Chequamegon-Nicolet National Forest in northern Wisconsin. The project at issue is a timber sale known as the "Twentymile" project. In the district court, the plaintiffs made several challenges to the adequacy of the EIS. On appeal, they argue only that the EIS failed to describe the reasonably foreseeable cumulative effects of another proposed timber sale, known as the "Twin Ghost" project. We conclude that at the time the EIS was being prepared, the Twin Ghost project was too nebulous to be discussed in any meaningful way, and thus affirm the district court's grant of summary judgment to the Forest Service.

## I. Background

The Chequamegon-Nicolet National Forest covers approximately 1.5 million acres in Northern Wisconsin. It consists of many lakes, rivers, and streams, is home to over 300 species of wildlife, and is visited by approximately 2.1 million people each year. The forest occupies land that was once clear-cut by nineteenth-century logging and forest fires. In the 1920s, the federal government began purchasing the land and managing it as a national forest. Because it emerged from the government's purchases of individual tracts of land, it is made up of a patchwork of public and private lands. In 1933, these were aggregated into two noncontiguous units. These came to be known as the Nicolet and Chequamegon units. Since 1993, these units have been managed

as a single entity, now known as Chequamegon-Nicolet National Forest, although the two units remain noncontiguous. (The Nicolet unit is located in the eastern half of northern Wisconsin, and the Chequamegon unit is located in the western half of northern Wisconsin.)

Since 2002, the Forest Service has proposed seventeen timber projects covering an area of approximately 130,000 acres. These timber projects are designed to advance a number of forest management goals; in particular, they are intended to ensure a diversity of tree ages in the forest (most of the trees are the same age because they were planted in the 1920s and 1930s when the forest was being restored.) The plaintiffs in this litigation have been involved in challenges to most of these projects through the administrative environmental review process. The plaintiffs have appealed final agency actions to the district court in six cases, settled with the Forest Service in four cases, and have refrained from challenging four timber sale approvals.

On December 23, 2004, the Forest Service announced the proposed Twentymile timber sale. This proposed sale was located immediately to the northwest of a previous timber sale, the Cayuga sale. The proposed Twentymile project would involve logging and roadbuilding on 8,875 acres of public land near Clam Lake in Bayfield County, Wisconsin. During administrative review, the plaintiffs submitted extensive commentary and argued that the cumulative effects from the Twentymile and Cayuga projects would have a significant impact on wildlife habitat. In particular, plaintiffs argued that the

Twentymile project would put the American Pine Marten at risk.[1]

Over the plaintiffs' objections, the Forest Service released its final EIS and Record of Decision ("ROD") in February 2007, authorizing the Twentymile project to move forward largely as originally proposed. The plaintiffs brought an administrative appeal pursuant to Forest Service regulations. That appeal was denied on May 24, 2007.

On June 22, 2007, the plaintiffs filed a civil complaint challenging the Twentymile Final EIS and ROD in the Eastern District of Wisconsin. Among other claims, plaintiffs contended that the Forest Service had violated the National Environment Policy Act's ("NEPA") requirement to fully and fairly analyze the cumulative environmental impacts of all "past, present, and reasonably foreseeable future actions" across the forest.

After the parties had briefed cross-motions for summary judgment and shortly before the scheduled oral

---

[1] The American Pine Marten is a "state-listed" endangered animal because its Wisconsin population is very small. The pine marten is a member of the weasel family, similar in size to a small house cat or full-bodied mink. By 1925, logging had driven the pine marten out of Wisconsin entirely. The Wisconsin Department of Natural Resources began reintroducing the pine marten in 1979. That reintroduction has not been particularly successful; however, the pine marten is not endangered in other areas of its range, and the Chequamegon pine marten population is not a significant portion of the total pine marten population.

argument, the Forest Service announced another new timber sale, the Twin Ghost project, located immediately to the south of the Twentymile timber sale and to the southwest of the Cayuga timber sale. The Twin Ghost project is not mentioned in the Twentymile EIS or ROD. However, it was identified in internal Forest Service documents in the Twentymile administrative record as a project "in the timber pipeline." The district court ordered supplemental briefing on the Twin Ghost project.

In their supplemental brief, the Forest Service conceded that the Twin Ghost project falls within the Forest Service's designated cumulative effects area for the Twentymile project and that it did not consider the Twin Ghost project during the EIS process for the Twentymile project. However, the Forest Service argued that the project was not reasonably foreseeable and thus its omission from the EIS was not error.

As part of the supplemental briefing, the Forest Service submitted a detailed affidavit describing the history of the Twin Ghost project. Forest Service staff first began to "think about" what types of management activity might be needed in the Twin Ghost area in 2005. The first step was to identify the potential goals of a restoration project conducted at some point in the future. This meant collecting data about the existing state of the vegetation, wildlife, roads, and other resources in the Twin Ghost area. This process began in the spring and summer of 2005 and was completed in the fall of 2007. (Recall that the final Twentymile EIS and ROD were released in February 2007, Habitat's administrative

appeal was denied in May 2007, and this suit was initiated on June 22, 2007.) In November 2007, the Forest Service identified a preliminary project boundary and an initial list of tree stands to consider for inclusion in the project. In January 2008, the Forest Service developed a list of goals for the Twin Ghost project. However, in February 2008, the Forest Service put planning for Twin Ghost on hold to focus on other priorities, and did not return its attention to Twin Ghost until October 2008, when it was added to the Forest Service's Schedule of Proposed Actions. In November 2008, Twin Ghost was disclosed to the public. As of the date of the district court's decision, the Forest Service continued to receive public comment about the proposal and no decision to implement the proposal had been made.

On January 12, 2009, the district court issued an opinion granting summary judgment to the Forest Service. Among other holdings not challenged here, the district court determined that the Twin Ghost timber sale was not "reasonably foreseeable" under NEPA. Plaintiffs appeal, and we now affirm.

## II. Analysis

We review de novo a district court's grant of summary judgment. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Review of agency action under NEPA is governed by the Administrative Procedure Act ("APA") and is limited to determining whether an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

When, as here, plaintiffs' claim is that an agency failed to prepare a satisfactory EIS, "the only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Environmental Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 682 (7th Cir. 2006).

However, before reaching the merits of the plaintiffs' argument, we must address the Forest Service's claim that the plaintiffs have forfeited their Twin Ghost argument by not raising it in the administrative proceeding or in the district court before cross-motions for summary judgment were filed. In support of its argument, the Forest Service relies on two cases: *Public Citizen v. United States Dept. of Transp.*, 541 U.S. 752 (2004), and *Kleissler v. U.S. Forest Service*, 183 F.3d 196 (3d Cir. 1999). In *Public Citizen*, the Supreme Court held that plaintiffs had forfeited their argument that the agency failed to consider alternatives because the plaintiffs had not raised new alternatives or urged the agency to consider new alternatives during the administrative process. 541 U.S. at 764. In *Kleissler*, the Third Circuit held that the plaintiff had failed to exhaust his administrative remedies by not presenting certain arguments in writing, instead raising them only informally at certain public meetings. 183 F.3d at 200-02.

We need not reach the merits of this forfeiture argument, because the argument itself has been waived. When the district court ordered supplemental briefing on the question of whether Twin Ghost was a reasonably

foreseeable future project, it asked the parties to discuss whether this question had been forfeited or waived. The Forest Service responded with only a short footnote in their supplemental brief. In this footnote, the Forest Service noted that the plaintiffs did not raise Twin Ghost before the agency. However, they did not claim, even in a conclusory manner, that this amounted to waiver, instead making a somewhat oblique reference to *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519 (1978), citing it for the proposition that parties "who wish to participate [must] structure their participation so that it is meaningful, so that it alerts the agency to [parties'] positions and contentions." The district court did not address the forfeiture issue in its opinion, presumably concluding from the lack of argument that the Forest Service did not intend to raise this issue.

It is not surprising that the Forest Service declined to press the argument that the plaintiffs should have argued earlier for the Twin Ghost project to be included in the EIS. This argument cuts directly against the Forest Service's main argument: that the Twin Ghost project was so far from taking shape that not even the Forest Service, let alone an outsider, could have said anything meaningful about it. The Forest Service did not make any attempt below to establish that the plaintiffs were aware of the Twin Ghost project and could have raised it during the administrative process. Having made the decision not to advance a forfeiture claim below, the Forest Service cannot change tacks and advance such an argument here.

On the merits, the plaintiffs argue that Twin Ghost was either a "present" or a "reasonably foreseeable future action" and thus should have been discussed in the EIS. *See* 40 C.F.R. § 1508.7 (requiring agencies to consider the cumulative environmental impacts of all "past, present, and reasonably foreseeable future actions"). They rely principally on the fact that during the EIS process, one Forest Service employee noted that Twin Ghost was "in the timber pipeline."[2] The Forest Service responds by arguing that while it knew in a general sense that there would be a project in the Twin Ghost area in the future, it did not know the scope or aims of this future project and thus could not speak meaningfully about it.

Plaintiffs rely heavily on *Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003). In *Mid States*, the Eighth Circuit considered a challenge to the Surface Transportation Board's approval of a railroad company's proposal to construct 280 miles of new rail line to reach the coal mines of Wyoming's Powder River Basin. Plaintiffs argued that the Board had failed to consider the impact on air quality that would result from the availability of cheaper coal after the rail lines were built. The defendant acknowledged that this was a potential consequence of the new lines but argued that it could not predict how many new plants would be built or how much coal these plants would consume. The Eighth Circuit rejected this argument, holding that

---

[2] This email, sent June 30, 2005, was included in the administrative record for the Twentymile project.

"when the *nature* of the effect is reasonably foreseeable but its *extent* is not, we think that the agency may not simply ignore the effect." *Id.* at 549-50 (emphasis in original). Here, plaintiffs argue that any project in the Twin Ghost area would include at least "some logging," and thus the agency should have discussed the potential impact of logging in the Twin Ghost area even if the extent of that logging was unknown.

The Forest Service, in contrast, relies on *Environmental Protection Information Center v. United States Forest Service* (*EPIC*), 451 F.3d 1005 (9th Cir. 2006). In *EPIC*, the Ninth Circuit held that "although it is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now, if not enough information is available to give meaningful consideration now, an agency decision may not be invalidated based on the failure to discuss an inchoate, yet contemplated, project." *Id.* at 1014. Several other circuits have similarly suggested that a project is not "reasonably foreseeable" if not enough is known to provide a meaningful basis for assessing its impact. *See Town of Marshfield v. FAA*, 552 F.3d 1, 4-5 (1st Cir. 2008) (discussion of cumulative impacts of future action not required where "some . . . action was foreseeable but one could only speculate as to which . . . measures would be implemented); *City of Oxford v. FAA*, 428 F.3d 1346, 1353 (11th Cir. 2005) ("An agency must consider the cumulative impacts of future actions only if doing so would further the informational purposes of NEPA"); *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 182 (3d Cir. 2000) ("[P]rojects that the city has merely

proposed in planning documents are not sufficiently concrete to warrant inclusion in the [environmental analysis] for the . . . project at issue here.").

We agree with our sister circuits that an agency decision may not be reversed for failure to mention a project not capable of meaningful discussion. To the extent plaintiffs are arguing that the Eighth Circuit's decision in *Mid States* is in tension with this consensus, we reject their reading of that decision. The court in *Mid States* concluded that adverse effects from the readily foreseeable increase in coal sales were certain to occur and questioned the defendant's contention that those effects could not be meaningfully forecast. 345 F.3d at 549. Thus, it is apparent that the Eighth Circuit thought some worthwhile discussion of the impact of the railroad on coal consumption could be had. It may well be that where, as in *Mid States*, the challenged cumulative effects are predictable, even if their extent is not, they may be more likely to be capable of meaningful discussion than in a case where the challenged omission is a future project so nebulous that the agency cannot forecast its likely effects. In any event, an agency does not fail to give a project a "hard look" simply because it omits from discussion a future project so speculative that it can say nothing meaningful about its cumulative effects. To hold otherwise would either create an empty technicality—a requirement that agencies explicitly state that they lack knowledge about the details of potential future projects—or paralyze agencies by preventing them from acting until inchoate future projects take shape (by which time, presumably, new inchoate projects would

loom on the horizon). This unreasonable result would replace the "tyranny of small decisions" with the impossible requirement that all agency action be comprehensive.

To illustrate the danger that the cumulative effects requirement was designed to protect against, it is useful to discuss another case relied on by the plaintiffs, *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998). In *Blue Mountains*, plaintiffs argued that the Forest Service had failed to consider the cumulative effects of several timber sales in a fire-ravaged portion of the Umatilla National Forest. Following the fire, the Forest Service proposed five logging projects in the same watershed, but performed no assessment of the combined impact of these projects. *Id.* at 1214-15. Importantly, these five projects were to proceed together as part of what the Forest Service itself acknowledged was a "coordinated [fire] recovery strategy." *Id.* at 1215. The Ninth Circuit enjoined the sales and ordered the Forest Service to prepare a comprehensive EIS. *Id.*

The contrast between this case and *Blue Mountains* is instructive. In *Blue Mountains*, the nature of all five logging projects was known in advance of the preparation of each project's environmental assessment. Indeed, all five sales had been disclosed to logging companies, with estimated sale quantities and timelines, before the environmental assessment at issue had even been prepared. *Id.* Here, the Forest Service had not yet developed the goals for the Twin Ghost project, let alone forecast the quantity and timing of logging that would take place. Not until the fall of 2007, months after the agency

issued the final EIS and ROD for the Twentymile project, had the Forest Service even gathered enough information about the existing state of Twin Ghost area to identify the goals of the Twin Ghost project. The environmental assessments at issue in *Blue Mountains* made no reference to the other contemporaneous timber sales, be it as past, present, or future sales. Here, because the Twin Ghost project is being developed well after the Twentymile proposal, its EIS must discuss the combined effects of Twin Ghost and Twentymile even if the Twentymile EIS cannot. *Cf. EPIC*, 451 F.3d at 1014 ("Once contemplated actions become more formal proposals, later impact statements on those projects will take into account the effect of the earlier proposed actions.") Finally, in *Blue Mountains* there were "substantial questions" for a cumulative effects analysis to address. *Id.* Here, because of the lack of information about the nature and scope of the Twin Ghost project, plaintiffs have not raised substantial questions about the cumulative effects of the two projects, instead arguing only that they should have been informed that some action might take place in the Twin Ghost area in the near future. Plaintiffs suggested that they would have "tailor[ed]" their comments differently had they known that the Twin Ghost project would be coming in the future, but they do not explain in any meaningful detail what additional analysis would have been possible from only the limited knowledge that some logging might take place in the Twin Ghost area in the future. Relatedly, they do not explain why, if the cumulative effects of the two projects will be harmful, this cannot be adequately addressed as part of the Twin Ghost EIS.

As the district court noted, some notice of Twin Ghost in the Twentymile EIS would have improved the document. It seems that the better practice would be to err on the side of disclosure, both to aid the public in understanding the Forest Service's plans and to avoid costly litigation. But without some indication that meaningful analysis could have accompanied this mention, it is not a substantial enough ground to invalidate the EIS and start over. The omission of Twin Ghost does not render the EIS any less of a hard look at the environmental consequences of the Twentymile project or cast any doubt on the conclusions drawn in that report.

## III. Conclusion

For these reasons, we AFFIRM the judgment of the district court.