# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1322 & 10-1346

HABITAT EDUCATION CENTER, INC., et al.,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES FOREST SERVICE, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
Nos. 2:04-cv-00254-LA and 2:03-cv-01023-LA—**Lynn Adelman**, *Judge.*

ARGUED FEBRUARY 22, 2011—DECIDED MARCH 7, 2012

Before WILLIAMS and TINDER, *Circuit Judges*, and
GOTTSCHALL, *District Judge.*[*]

WILLIAMS, *Circuit Judge.* The plaintiffs, Habitat Ed-
ucation Center, Inc., a citizens' organization engaged

---

[*] Of the United States District Court for the Northern District
of Illinois, sitting by designation.

in forest, wildlife, and natural resource protection, two of its officers, and the Environmental Law & Policy Center successfully sued to enjoin a number of logging projects planned for the Chequamegon-Nicolet National Forest (the "Forest"). The district court later lifted its injunction after finding that the defendants took the appropriate corrective action to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*

The plaintiffs argue that the injunction should not have been lifted because the United States Forest Service failed to consider how a future project in the Forest's Fishel area might alter the cumulative impacts analysis it presented in the draft environmental impact statements for projects in the McCaslin and Northwest Howell areas of the Forest. But we find that the Fishel project was formally proposed after the Forest Service issued those draft statements, and it is neither arbitrary nor capricious for an agency to exclude from the cumulative impacts analysis presented in its final statement those projects that (1) only become capable of meaningful discussion after the agency has issued its draft statement, and (2) do not significantly alter the environmental landscape presented in the draft. The plaintiffs also argue that the Forest Service should have supplemented its statements, but we do not find that the agency acted arbitrarily by failing to do so. Finally, the plaintiffs insist that the Forest Service should have strictly followed NEPA's procedures for indicating incompleteness. However, we conclude that NEPA does not require an agency to generate paperwork bearing no meaningful effect on the substance of pending proposals. Accordingly, we affirm.

## I. BACKGROUND

The Forest covers more than 1.5 million acres in northern Wisconsin, contains mostly northern hardwood, mixed conifer, and aspen trees, and is home to more than 300 species of wildlife. It consists of two noncontiguous tracts of land: the Chequamegon, which is located on 858,400 acres in northwest and north-central Wisconsin, and the Nicolet, which occupies 661,400 acres in the northeastern part of the state. Though noncontiguous, the Chequamegon and the Nicolet have been managed by the Forest Service as a single entity since 1993. Among the many species cohabiting the Forest are the red-shouldered hawk, the goshawk, and the American marten. Each has been identified as "Regional Forester's Sensitive Species" and "Management Indicator Species." Those designations require emphasis in planning, analysis of adverse effects on the population, habitat, and viability of the species, and monitoring during forest plan implementation.

In 2000, the Forest Service began planning a timber harvesting project in the McCaslin area on the Nicolet side of the Forest. In 2003, it issued a record of decision ("ROD") indicating that it would pursue a project in the McCaslin area that consisted of 8,876 acres of logging, three miles of road construction, and seven miles of road reconstruction. That same year, the Forest Service approved five other timber harvesting projects for the Forest. Of relevance here, one of the approved projects proposed 7,000 acres of logging, two miles of road construction, and 24 miles of road reconstruction in the Forest's Northwest Howell area.

The Forest Service contends that both the McCaslin and the Northwest Howell projects are congruent with the current management plan for the Forest, issued in 2004, which seeks to return the Forest to conditions that more closely approximate a natural forest by increasing structural diversity through "selective harvest[ing]." In its opinion, removing certain trees will open up small gaps in the forest canopy allowing sunlight to reach a new generation of trees on the forest floor, reduce the density of stands to permit the remaining trees to grow more rapidly, and create a more complex forest structure that improves both the ecological and economic value of the stands. And returning the Forest to conditions that more closely approximate a natural forest will improve the habitat and long-term viability of a range of species living there.

The plaintiffs disagree. They insist that the McCaslin and Northwest Howell projects (as well as other projects proposed for the Forest) threaten the viability of the red-shouldered hawk, the goshawk, and the American marten by adversely affecting their natural habitats. To prevent this from happening, the plaintiffs administratively appealed the RODs issued for the McCaslin and Northwest Howell projects, and tried to informally resolve their dispute with the Forest Service. Unsuccessful, the plaintiffs initiated this action in the Eastern District of Wisconsin, under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, alleging violations of, among other things, NEPA and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687. The plaintiffs sought to enjoin the Forest Service, its Chief,

and the Secretary of the United States Department of Agriculture from effectuating the McCaslin and Northwest Howell projects.

In two separate suits, the plaintiffs alleged that the Forest Service violated NEPA by: (1) failing to consider the cumulative impacts on the environment of past, present, and reasonably foreseeable future logging projects; and (2) failing to consider sound, high-quality scientific information indicating that the McCaslin and Northwest Howell projects will harm the red-shouldered hawk, goshawk, and American marten. The plaintiffs also alleged that the Forest Service violated NFMA by: (1) approving the two projects based on an outdated 1986 forest plan; (2) allowing greater road density in the McCaslin area than the 1986 plan permitted; and (3) failing to collect data indicating the effect of the project on management indicator species. Finding the cumulative impacts analysis for the two projects insufficient, the district court reversed the Forest Service's decision, remanded the case for reconsideration, and enjoined implementation of the McCaslin and Northwest Howell projects until the Forest Service completed an environmental impact statement ("EIS") for each that complied with NEPA. *Habitat Educ. Ctr. v. Bosworth* (*Howell I*), 363 F. Supp. 2d 1090, 1098-99 (E.D. Wis. 2005); *Habitat Educ. Ctr. v. Bosworth* (*McCaslin I*), 363 F. Supp. 2d 1070, 1078 (E.D. Wis. 2005). The court denied the plaintiffs' motions in all other respects.

On remand, the Forest Service prepared a Supplemental Environmental Impact Statement ("SEIS") for

the McCaslin project and an SEIS for the Northwest Howell project. It issued a draft SEIS for each individual project in January 2006. Eight months later, in September 2006, the Forest Service issued final statements and re-approved both projects. The Forest Service then filed motions in the district court to lift the injunctions issued in *McCaslin I* and *Howell I*. The district court, however, denied the motions because it found that the Forest Service did not show that the statements complied with NEPA. The parties later filed cross-motions for summary judgment addressing the adequacy of the statements under NEPA.

In their motion for summary judgment, the plaintiffs argued that the statements did not comport with NEPA because, among other things, they failed to discuss reasonably foreseeable projects that were formally proposed after the issuance of each draft SEIS and were scheduled to occur on the Nicolet side of the Forest in the near future. The plaintiffs highlighted the Fishel Vegetation and Transportation Management Project that was proposed on March 9, 2006, six months before the Forest Service issued final statements for the McCaslin and Northwest Howell projects. The Fishel proposal identified the project's boundaries, stated its objective, and identified the precise action to be undertaken. It also estimated the number of acres that would be affected by the project and the volume of timber that would be made available for sale.

The district court determined that the Fishel project was reasonably foreseeable, as contemplated under

NEPA, at the time the Forest Service issued the final statements for the McCaslin and Northwest Howell projects. But the court granted the Forest Service's motion to lift the injunction "because the *draft* [statements were] issued in January 2006, two months before the Fishel project was formally proposed*." Habitat Educ. Ctr. v. U.S. Forest Serv.* (*McCaslin II*), 680 F. Supp. 2d 1007, 1018 (E.D. Wis. 2010) (emphasis in original); *accord Habitat Educ. Ctr. v. U.S. Forest Serv.* (*Howell II*), 680 F. Supp. 2d 996, 1004 (E.D. Wis. 2010). The court found that the Forest Service could not have meaningfully discussed the Fishel project in either the McCaslin or the Northwest Howell draft SEIS. And because the administrative record did not indicate that the anticipated effects of the Fishel project would seriously change the environmental landscape presented in the draft statements, the district court concluded that the Forest Service was not required to further supplement the McCaslin and Northwest Howell projects' respective statements. *McCaslin II*, 680 F. Supp. 2d at 1019; *Howell II*, 680 F. Supp. 2d at 1005. The court granted summary judgment to the defendants and lifted the injunctions. The plaintiffs appealed both cases, which we have consolidated.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo. *Habitat Educ. Ctr. v. U.S. Forest Serv.* (*Twentymile*), 609 F.3d 897, 900 (7th Cir. 2010). An agency decision that allegedly violates NEPA may be set aside

under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When the issue presented is whether an agency has failed to prepare a satisfactory EIS, the court's role is to ensure that the agency "has taken a 'hard look' at environmental consequences." *Twentymile*, 609 F.3d at 900 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)) (first internal quotation marks omitted). Our review, while deferential, must be "searching and careful" and may not condone a "clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal citation and quotation marks omitted).

When a federal agency, like the Forest Service, elects to pursue any major action that might significantly affect the environment, it must comply with the procedures set forth in NEPA. That statute commands agencies to prepare an EIS unless the action under consideration is categorically excluded or an "environmental assessment"[1] shows that no EIS is needed. 40 C.F.R. § 1501.4. An EIS is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003) (citation and internal quotation marks omitted). If the

---

[1] An environmental assessment is a "concise public document . . . that . . . [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9.

agency does not prepare an EIS, it must prepare and make publicly available a "finding of no significant impact." 40 C.F.R. § 1501.4(e).

To begin the process of preparing an EIS, an agency must publish a notice of intent in the Federal Register. 40 C.F.R. § 1501.7. The agency will then undertake what is generally known as the "scoping process," to determine the scope of the issues to be addressed in the EIS. *Id.* After deciding on the scope, the agency conducts the environmental study and prepares a draft EIS. The draft must then be made publicly available, and the agency must obtain or request comments on the draft from other federal agencies, state and local agencies authorized to enforce environmental standards, affected Indian tribes, and interested or affected organizations or members of the public. 40 C.F.R. § 1503.1. The agency will then consider the comments, and respond to any issue that the draft does not adequately discuss in a published "final" EIS. If at any point the agency makes "substantial changes" in the proposed action, or there are "significant new circumstances or information" relevant to environmental concerns, the statute requires the agency to prepare supplements to either the draft or final EIS to account for the change or new information. 40 C.F.R. § 1502.9(c)(1)(i), (ii). After completing these steps, the agency issues a ROD explaining its final decision and the reasons for its choice among the alternatives considered.

As part of the EIS preparation process, NEPA requires agencies to analyze the cumulative impacts of past, present, and reasonably foreseeable projects on the environ-

ment. 40 C.F.R. § 1508.25(a)(2). Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7. In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). This ensures that a federal agency will not act on incomplete information, only to regret its decision after it is too late to correct. *Marsh*, 490 U.S. at 371 (citation omitted).

On appeal, the plaintiffs attack three aspects of the process that the Forest Service undertook in preparing environmental impact statements for the McCaslin and Northwest Howell projects. First, they argue that the Forest Service failed to consider the Fishel project in its cumulative impacts analysis for the McCaslin and Northwest Howell projects. Next, they contend that even if the Fishel project was not reasonably foreseeable when the McCaslin and Northwest Howell draft statements were issued, the Forest Service failed to supplement those statements as required by NEPA. Finally, the plaintiffs insist that, at the very least, the Forest Service should have strictly complied with NEPA's procedure for indicating that its analysis of the McCaslin and Northwest Howell projects was incomplete. We address each issue in turn.

### A. The Forest Service's Exclusion of Fishel from Its Cumulative Impacts Analysis Was Not Arbitrary, Capricious, or Contrary to Law.

The issue raised by the plaintiffs' first contention is whether the Forest Service should have included the Fishel project in the cumulative impacts analysis presented in the final statements even though the Fishel project could not be meaningfully discussed until after the McCaslin and Northwest Howell draft statements were issued. In considering this question, we remain cognizant of the need to avoid interpreting NEPA in a way that would "paralyze agencies by preventing them from acting until inchoate future projects take shape (by which time, presumably, new inchoate projects would loom on the horizon)." *Twentymile*, 609 F.3d at 903. Instead, we should, to the fullest extent possible, interpret NEPA and its regulations strictly in accord with the twin goals of the statute: ensuring "that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental im-pacts," and guaranteeing that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (citation omitted). NEPA does not require agencies "to elevate environmental concerns over other appropriate considerations"; rather, it demands only "that the agency take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citation omitted). The statute "does not mandate particular results"; it "simply pre-

scribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

The Council on Environmental Quality ("CEQ"), established by NEPA, has promulgated regulations that set forth with specificity the process by which an EIS must be prepared. 40 C.F.R. § 1502.9(a)-(c). We give "substantial deference" to those regulations when interpreting NEPA. *Marsh*, 490 U.S. at 372; *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003). The regulations require that an EIS "be prepared in two stages": a draft EIS, and a final EIS. 40 C.F.R. § 1502.9(a), (b). The former "must fulfill and satisfy to the fullest extent possible the requirements established for final statements." *Id.* § 1502.9(a). The latter "shall respond to comments as required . . . [and discuss] any responsible opposing view which was not adequately discussed in the draft statement." *Id.* § 1502.9(b). This regulatory scheme front-loads the EIS's analytic process, and contemplates publication of a final EIS that addresses issues raised about the draft. *E.g.*, *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1183 (9th Cir. 2011) ("In sum, the SEIS dedicates over 120 pages to raising and meaningfully responding to public critiques. That is all NEPA requires."); *cf. Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1288 (1st Cir. 1996) ("Instead of 'rigorously explor[ing]' the alternative of using artificial water storage units instead of Loon Pond, the Forest Service's Final EIS did not respond to these comments at all . . . . This failure violated the Forest Service's EIS obligation under NEPA." (alteration in original)).

The district court concluded that because most of the heavy lifting involved in the environmental impact analysis must occur before the draft EIS is completed, the Forest Service may exclude from its final EIS's cumulative impacts analysis any project that cannot be meaningfully discussed at the time the draft EIS is issued. That holding is consistent with the position taken by the D.C. Circuit on a related question. *Cf. Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010) (holding that it is not "arbitrary and capricious for the [agency] to omit from its cumulative impact analysis other projects for which nothing had been completed except notices of intent, each published after the . . . draft EIS had been released."). We agree with the district court and find our sister circuit's decision instructive. We therefore hold that a federal agency does not act arbitrarily or capriciously by excluding from its final EIS those projects that cannot be meaningfully discussed at the time the agency issues its draft EIS and do not significantly alter the environmental landscape as presented in that draft.

Strictly construed, NEPA and the CEQ regulations permit an agency to issue a final EIS that does no more than incorporate a previously issued draft EIS and respond to comments received regarding that draft (assuming, of course, that the draft complies with NEPA). That seems to be what occurred here. The Forest Service excluded the Fishel project from its final statements because the Fishel project was not capable of meaningful discussion at the time the McCaslin and Northwest Howell draft statements were issued, and the Fishel project did not

alter the environmental landscape presented in the draft (an issue we discuss more fully below). We cannot say that the Forest Service's decision was arbitrary, capricious, or contrary to law. To hold otherwise would paralyze federal agencies by transforming the two-stage EIS preparation process into an endless loop of creating and recreating draft statements. NEPA does not require federal agencies to do the impractical. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996). And logic dictates that at some point an agency must be allowed to move beyond the draft EIS. In our view, unless newly discovered information requires supplementation, that point is reached when the draft is issued. It was therefore not a "clear error of judgment" for the Forest Service to reach the same conclusion.

**B.  The Forest Service's Decision Not to Supplement Also Was Not Arbitrary, Capricious, or Contrary to Law.**

Where a future project is not reasonably foreseeable at the time an agency issues a draft EIS for a current project, we cannot say that the agency's decision to exclude the future project from the cumulative impacts analysis it presents in its final EIS is arbitrary, capricious, or otherwise contrary to law. But, importantly, this does not mean that the agency is free to ignore any new information that comes to light in the interval between the draft and final EIS. Instead, the agency must take a hard look at the new information and deter-

mine if supplementation is necessary. Our inquiry into the propriety of supplementation is a separate one. We therefore turn to the appellants' argument that the Forest Service should have further supplemented the McCaslin and Northwest Howell statements.

An agency's decision whether to supplement an EIS is subject to the "rule of reason," and we review that decision under the APA's "arbitrary and capricious" standard. *Marsh*, 490 U.S. at 376. We take care to distinguish between claimed deficiencies in an EIS that are "merely flyspecks" and those that are "significant enough to defeat the goals of informed decisionmaking and informed public comment." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002) (citation omitted).

The CEQ regulations impose a duty on all federal agencies to supplement either a draft or a final EIS if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Supplementation is not required every time new information comes to light—otherwise, agency decisionmaking would be rendered "intractable, always awaiting updated information only to find the new information [is] outdated by the time a decision is made." *Marsh*, 490 U.S. at 373. But NEPA does require an agency to take a "hard look" at the environmental impacts of its planned action, even after a proposal has received initial approval. *Id.* at 374.

The question before us, whether the Forest Service should have published additional supplements to the McCaslin and Northwest Howell statements, is a "classic example of a factual dispute the resolution of which implicates substantial agency expertise," *Id.* at 376, because "'the determination of the extent and effect of [cumulative impact] factors . . . is a task assigned to the special competency of the appropriate agencies.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (brackets in original) (quoting *Kleppe*, 427 U.S. at 414). Moreover, the agency need only supplement an environmental impact statement if the new circumstance or information is "significant," 40 C.F.R. § 1508.27(b)(7), and determining significance is "a factual question requiring technical expertise." *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 8 (1st Cir. 2008) (citation omitted).

The Forest Service's cumulative impacts analysis for McCaslin and Northwest Howell is not alleged to contain any deficiencies other than its failure to consider the Fishel project. A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. By nature of that definition, the cumulative impacts of McCaslin, Northwest Howell, and Fishel together will be considered at some point before each of the three projects are undertaken. Indeed, "present" projects (McCaslin and Northwest Howell), if adopted and implemented, will become "past" projects with which any future project (Fishel) must be cumulatively considered

before that future project may be implemented without running afoul of NEPA. Where, as here, future action is too inchoate to be meaningfully discussed at the time the agency issues a draft EIS for two current projects, the environment remains protected against the cumulative impacts of all three projects together because the future action must eventually be analyzed as a "present" action, taking into account the other two, now "past," projects. More importantly, if new information about a future project becomes clear while the current projects are pending, and that information significantly alters the previously presented environmental landscape, the agency would be required to issue a supplement to its draft or, if issued, final EIS. *See* 40 C.F.R. § 1502.9(c)(1) (explaining that agencies "[s]hall prepare supplements to either *draft or final* environmental impact statements" (emphasis added)).

The issue of supplementation was front and center in *Marsh*. The plaintiffs in that case argued that the defendant, U.S. Army Corps of Engineers, should have supplemented the final EIS issued for construction of a portion of the three-dam project because new information emerged, which allegedly undermined the Corps' environmental impact analysis. *Marsh*, 490 U.S. at 369. The plaintiffs relied on two documents to support their contention: an internal memorandum prepared by two Oregon Department of Fish and Wildlife biologists, which suggested the dam would adversely affect downstream fishing, and a soil survey prepared by the United States Soil Conservation Service, which the plaintiffs claimed indicated greater downstream turbidity than

did the final EIS. *Id.* Rejecting the plaintiffs' claims, the Court held that "the Corps had a duty to take a hard look at the proffered evidence. However, having done so and having determined based on careful scientific analysis that the new information was of exaggerated importance, the Corps acted within the dictates of NEPA in concluding that supplementation was unnecessary." *Id.* at 385.

*Marsh* is instructive. In contrast to that case, however, the plaintiffs here have not identified any evidence to support their claim that the Fishel project significantly altered the environmental landscape presented in the McCaslin and Northwest Howell final statements. But even accepting the Fishel project's significance, it was neither arbitrary nor capricious for the Forest Service to refrain from further supplementing its final statements. The Forest Service need only take a "hard look" at the concerns raised by the plaintiffs. It effectively did so in two ways. First, it included in its cumulative impacts analysis for McCaslin and Northwest Howell an assumption that all future projects, including Fishel, "must be consistent with the protective requirements for [Regional Foresters' Sensitive Species] of the 2004 Forest Plan," and that such projects "will not occur if their additive effects are unacceptable." Second, it made clear that the cumulative impacts of all three projects would be addressed in the Fishel project's EIS. The Forest Service, in fact, made good on that promise by including that very analysis in the EIS issued for Fishel. And nothing in the record undermines the validity of the Forest Service's stated analytic assumption. Therefore,

we are satisfied that the Forest Service made a "reasoned decision based on its evaluation of the [Fishel project's] significance" that the project did not significantly alter the environmental landscape, and that the cumulative impact of the Fishel, McCaslin, and Northwest Howell projects together would be adequately addressed in the not-too-distant future. *See id.* at 377-78 ("Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." (citations and internal quotation marks omitted)). There may be cases in which an agency faced with newly discovered information evidencing a significant change in the environmental landscape must supplement an EIS to comply with NEPA, *e.g., Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703-04 (9th Cir. 1993) (affirming injunction because agency did not consider intervening U.S. Fish and Wildlife Service report that "'raise[d] serious questions'" about the agency's analysis), but this is not one of them. *See Wis. v. Weinberger*, 745 F.2d 412, 420 (7th Cir. 1984) ("An original EIS is no longer 'adequate as a source of information necessary to a rational decision on the relative risks and benefits' of a proposed action not because it fails to 'include' new information or any 'evaluation' of it, but because the new information presents a seriously different picture of the likely environmental harms stemming from the proposed action." (emphasis omitted)).

Our dissenting colleague would find that the Forest Service's explanation that the Fishel Project must comport with the Forest Plan and have acceptable additive effects

on the environment does not provide sufficient evidence of a "hard look" at the information revealed by Fishel's scoping notice. The objection raised is reasonable, but contrary to the deference we owe to federal agencies on this question. And the cases cited by the dissent illustrate this point.

In *Natural Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 562 (2d Cir. 2009), the petitioners insisted that the FAA should have supplemented because it "did not consider the effects of secondary development in areas" outside of the identified 75,000-acre West Bay Sector Plan. The Second Circuit rejected the petitioners' argument, however, because among other things the plan "already takes into account many of the secondary effects about which petitioners express concern. To the extent that new roads and dwellings may adversely affect the woodpecker in areas beyond the West Bay Sector Plan, such construction may itself become the object of an appropriate study" under NEPA. *Id.*; *see also Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 529-30 (9th Cir. 1994) ("Fires are natural occurrences in the Laguna Greenbelt area. The EIS takes the occurrence of fire into account and existing mitigation measures in the EIS consider the possibility of fire.").

As the dissent notes, *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 445 (4th Cir. 1996) is a case where the reviewing court held that an agency acted arbitrarily by not supplementing its EIS in light of new information. But that case was decided on a substantially different record than what we have here. In *Hughes*,

the agency failed to consider evidence from six experts showing that, contrary to the agency's prediction, the area in question "would not become heavily infested [with zebra mussel] without the Project." *Id.* The Fourth Circuit found the agency's review of this new information wanting because "a District Office biologist simply made two telephone calls to the Corps's water quality section and elicited the opinions from two individuals that all the district's reservoirs would eventually become infested and . . . could possibly become infested from fish bait buckets." *Id.* According to the Fourth Circuit, the "only glimmer of reasoning" provided by the agency was the "notation" that current fishing would possibly lead to infestation from fish bait buckets, and "the only information regarding the qualifications of the person who supplied this reasoning is that he was an employee of the Corps's water quality section." *Id.*

The important distinction in this case is that the record is devoid of any new scientific evidence that might have caused the Forest Service to reassess the assumptions underlying its previous cumulative impacts analysis. More importantly, the determination to be made about the weight of such new evidence is one particularly suited for the agency's discretion and expertise, not this court's. *See, e.g., Winthrop*, 535 F.3d at 11 ("[I]t was not arbitrary and capricious for the FAA to conclude that it had enough data to make a reasoned decision. There will always be more data that could be gathered; agencies must have some discretion to decide when to draw the line and move forward with decisionmaking.").

The particular facts of this case favor deference to the agency. Unlike *Hughes*, this case does not involve disclosure of new information about how a project might harm a previously overlooked species; rather, it involves a revelation of additional information about a future project for which the agency had already made assumptions and incorporated those assumptions into its analysis. On this record, we think the Forest Service's failure to supplement was neither arbitrary nor capricious. *See Marsh*, 490 U.S. at 385. ("Even if another decisionmaker might have reached a contrary result, it was surely not 'a clear error of judgment' for the Corps to have found that the new and accurate information contained in the documents was not significant and that the significant information was not new and accurate.").

### C. The Forest Service Made Clear that It Lacked Information to Meaningfully Discuss Fishel.

The plaintiffs' final contention is that the Forest Service violated NEPA by not strictly complying with 40 C.F.R. § 1502.22, which mandates that an agency indicate its analysis is incomplete if such is the case. The Forest Service's compliance with § 1502.22 is subject to the "rule of reason." *See* 40 C.F.R. § 1502.22(b)(4) ("[A]nalysis of the impacts . . . is within the rule of reason.").

Importantly, the regulations demand that federal agencies "make clear that . . . information is lacking" when "evaluating reasonably foreseeable significant adverse effects on the human environment" and such evaluation is not complete. *Id.* The plaintiffs argue that agencies

must do more; they demand that the Forest Service strictly follow the specific procedures outlined in subsections (b)(1) through (4) of 40 C.F.R. § 1502.22. Those subsections direct an agency to issue a statement that (1) identifies its information as incomplete; (2) clarifies the missing information's relevance to its evaluation of the environmental impacts; (3) summarizes relevant scientific evidence; and (4) evaluates the environmental impacts using generally accepted "theoretical approaches or research methods." *Id*. § 1502.22(b)(1)-(4). But they apply only "[i]f the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known." *Id.* § 1502.22(b). The Forest Service has never taken the position that its cumulative impacts analysis did not include the Fishel project because of exorbitant costs. Nor has it maintained that the means to obtain a cumulative analysis of all three projects were "not known." Instead, the Forest Service has consistently contended that the Fishel project was not reasonably foreseeable at the time it issued the draft supplemental statements for McCaslin and Northwest Howell, and the cumulative analysis for all three projects would be presented in the Fishel EIS. Under these circumstances, an agency need only have made clear that information was lacking to comply with the regulations. The Forest Service did just that.

In its draft supplemental statements for McCaslin and Northwest Howell, the Forest Service stated that although the Fishel Project was likely to be proposed soon, the

agency did not have sufficient information to discuss its impacts at the time. The Forest Service also explained that the cumulative impacts of all three projects would be considered and discussed in the EIS the agency intended to issue for the Fishel project.[2] The regulations do not prescribe the precise manner through which an agency must make clear that information is lacking. The manner by which Forest Service elected to convey its lack of information was not a clear error of judgment or otherwise contrary to law. *See Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999) ("[W]e are unwilling to give a hyper-technical reading of the regulations to require the Forest Service to include a separate, formal disclosure statement in the environmental impact statement to the effect that lynx population data is incomplete or unavailable. Congress did not enact the National Environmental Policy Act to generate paperwork or impose

---

[2] The supplemental statements stated specifically that "there are two proposals that will be put out for the initial public scoping in the near future, the Fishel project and the Spruce Decline II project. Neither proposal was sufficiently detailed for use at the time the cumulative effects analysis was completed for the Northwest Howell or McCaslin SEIS analysis. These projects were in the very early stages of development and there wasn't a specific proposal to do detailed quantitative analysis. However, Fishel and Spruce Decline II will be consistent with the 2004 Forest Plan. In addition, when the environmental analysis is done for these new projects, they will look at current projects (such as McCaslin and Northwest Howell) as part of their disclosure of cumulative impacts."

rigid documentary specifications."). While it might be better for an agency to always follow the § 1502.22(b) procedures when it lacks information relevant to its cumulative impacts analysis, we cannot substitute our own judgment for that of the agency. And we should not impose an "empty technicality—a requirement that agencies explicitly state that they lack knowledge about the details of potential future projects." *Twentymile*, 609 F.3d at 902-03. Given our deferential review, the Forest Service's statement of incompleteness was sufficient. *See* 40 C.F.R. § 1500.3 ("[A]ny trivial violation of these regulations [does] not give rise to any independent cause of action.").

   NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The statute emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decisionmaking and prevent an agency from "act[ing] on incomplete information, only to regret its decision after it is too late to correct." *Marsh*, 490 U.S. at 371. NEPA's purpose, however, "is not to generate paperwork—even excellent paperwork—but to foster excellent action." 40 C.F.R. § 1500.1(c). Because the Forest Service could not meaningfully discuss the Fishel project when the draft statements for the McCaslin and Northwest Howell projects were issued, analysis of the cumulative impacts of all three projects likely would be, and indeed was, discussed in the Fishel project's EIS, and nothing in the record suggests that the Fishel project significantly altered the environmental landscape presented in

those draft statements, the plaintiffs' plea amounts to a request that the agency generate more paperwork to further (and somewhat retroactively) justify actions that it proposed, analyzed, and adopted in substantial compliance with NEPA. The statute, however, is intended to foster excellent and environmentally conscious action, not prevent it. We believe that our holding aligns with the essential purpose of NEPA.

## III. CONCLUSION

For the reasons stated above, the district court's decision to grant summary judgment to the defendants and lift the injunctions is AFFIRMED.

GOTTSCHALL, *District Judge,* dissenting in part. I agree in large part with the majority, and as a result I gladly join the opinion as to Parts II.A and II.C, as well as much of Part II.B. When the draft supplemental environmental impact statements ("SEISs") for McCaslin and Northwest Howell were issued, the Fishel project was too indefinite to be meaningfully discussed; therefore, the Forest Service properly excluded the Fishel project from McCaslin's and Northwest Howell's cumulative impacts analyses. I agree that when new information about a

future project becomes clear only after a draft EIS for a current project has already been issued, the agency is not required to amend the draft EIS's cumulative impacts analysis to take account of the new information. (Maj. Op. at 13-14.) As the majority states, once the draft EIS has been issued and new information comes to light, the agency is required to "take a hard look at the new information," apply a rule of reason, and make a decision whether to supplement.[3] (Maj. Op. at 14-15.) The agency must supplement when the new information "significantly alters the previously presented environmental landscape," (Maj. Op. at 17 (citing 40 C.F.R. § 1502.9(c)(1))), and pursuant to *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), the determination of whether new information "significantly alters the previously presented environmental landscape" is at first instance a decision of the agency—a decision to which this court owes considerable deference. Thus, I agree with

---

[3] The Appellants indicate that the agency could choose to amend the cumulative impacts analysis in the draft EISs rather than prepare a supplement. (*See* Reply Br. at 14 ("Whether the Fishel project was incorporated into the cumulative impacts analysis in the Final EISs or whether the agency should have prepared a full-blown supplement to those EISs is not the question here. In this case, because the Forest Service failed to either include the Fishel timber sale project in the Final EISs' cumulative impacts analysis *or* prepare a supplement, the Forest Service violated NEPA.").) I do not intend to suggest that an amendment of the cumulative impacts analyses would be insufficient.

*Marsh* and the majority that once it has taken the required hard look, the agency's decision not to prepare a supplement should not be set aside unless it is "arbitrary and capricious." *Id*. at 374-75.

Unlike the majority, however, I cannot find *any* evidence in this record that the Forest Service took the hard look which the law requires. Because nothing in the record justifies the Forest Service's decision not to supplement the McCaslin and Northwest Howell SEISs to take account of Fishel, I find the agency's failure to supplement arbitrary and capricious, and I disagree with Part II.B. of the majority opinion. For this reason, I cannot join in the majority's decision to affirm the district court's grant of summary judgment to the Appellees in this case.

On March 9, 2006—after the draft SEISs for McCaslin and Northwest Howell were issued in January 2006, but before they were issued in final form in September 2006—the Forest Service issued a scoping notice for the Fishel project, which Judge Adelman described as a "formal proposal."[4] In this proposal, Judge Adelman

---

[4] Although Judge Adelman refers to the Forest Service's notice of March 9, 2006 as a "formal proposal," the parties have described this March 9, 2006 notice as a "scoping notice." (*See* Separate App. of Appellants at 3.) NEPA regulations contemplate a notice of intent, 40 C.F.R. § 1508.22; followed by a proposal, *id.* § 1508.23; followed by a scoping notice, *id.* § 1508.25; followed by the draft and final environmental

(continued...)

found, "the Forest Service identified the project's boundaries, stated the project's objectives, and identified the precise action it proposed to take." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 680 F. Supp. 2d 1007, 1018 (E.D. Wis. 2010). The Forest Service had also "estimated the number of acres that would be affected by the project and the volume of timber that would be made available for sale." *Id.* For these reasons, Judge Adelman explicitly found that "the Fishel project was a reasonably foreseeable future action that could have been meaningfully discussed." *Id*. The Forest Service has not taken issue with Judge Adelman's finding that the Fishel project became "reasonably foreseeable" at this point, although it equivocates on the issue of whether the project could have been meaningfully discussed. It admits, however, that Fishel "was no longer entirely speculative." (Br. for the Appellees at 42-43.) Appellants argue that once the Fishel project became reasonably foreseeable, the Forest Service should have prepared supplements to the McCaslin and Northwest Howell SEISs to analyze the cumulative impacts of McCaslin and Northwest Howell, as affected by the upcoming Fishel project.

The majority concludes that the Forest Service satisfied its obligation to take a hard look at the impact of Fishel on

---

[4] (...continued)

impact statements. *Id.* § 1502.9(a) (noting that draft EISs "shall be prepared in accordance with the scope decided upon in the scoping process"); § 1502.9(b) (noting that the final EIS "shall respond to comments" on the draft). The majority assumes, as do I, that this formal proposal constituted new information sufficient to trigger the hard look requirement.

McCaslin and Northwest Howell in two ways. First, the Forest Service "included in its cumulative impacts analysis for McCaslin and Northwest Howell an assumption that all future projects, including Fishel, 'must be consistent with the protective requirements for [Regional Foresters' Sensitive Species] of the 2004 Forest Plan,' and that such projects 'will not occur if their additive effects are unacceptable.'" (Maj. Op. at 18 (quoting Appellees' Supp. App. at 34).) Second, the Forest Service "made clear that the cumulative impacts of all three projects would be addressed in the Fishel project's EIS." (*Id.*)

With respect to the first, the Forest Service is merely stating that (a) it intends to comply with its Forest Plan, and (b) it will not approve future projects like Fishel if the additive effects of Fishel, McCaslin and Northwest Howell are "unacceptable." This is nothing but a statement that the Forest Service intends to follow the requirement that it protect the Regional Foresters' Sensitive Species outlined in the 2004 Forest Plan, which it is legally required to do. *See* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.10 ("All site-specific decisions, including authorized uses of land, must be consistent with the applicable plan."); *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1068 n.4 (9th Cir. 1998) ("Here, 16 U.S.C. § 1604(i) plainly imposes a legal obligation on the Forest Service to ensure that timber sales are consistent with the relevant Forest Plan."). With respect to the second—that the cumulative impacts of all three projects

would eventually be addressed in the Fishel project's EIS—the idea that consideration of any significant information can be deferred to a future project's EIS is inconsistent with the design of NEPA. In the words of the Ninth Circuit, "NEPA is not designed to postpone the analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002). The regulations clearly state that an appropriate analysis of cumulative impacts requires that "the incremental impact of the [present] action" be "added to the past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. The law is clear that deferring a cumulative impacts analysis until a future EIS for another project is impermissible unless the agency has properly decided that deferral is scientifically justifiable.

The agency's obligations in considering whether to prepare a supplement, and the court's standard of review of the agency's decision, were articulated clearly in *Marsh. Marsh* held that an agency's decision not to supplement "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise," 490 U.S. at 376, and courts "must defer to 'the informed discretion of the responsible federal agencies.'" *Id.* at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). The agency has a responsibility with respect to any new information, however, and that responsibility is to take a hard look at it, "regardless of its eventual assessment of the significance of [the] informa-

tion." *Id.* at 385. If major federal action remains to occur,[5] and the new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS is required. *Id.* If, after taking a hard look, the agency determines that the new information does not affect the quality of the human environment in a significant manner or to a significant extent not already considered, the agency is not required to prepare a supplement, and its decision not to do so will be upheld unless arbitrary and capricious. *See id.* at 377.

In making the determination of whether the agency's decision not to supplement was arbitrary and capricious, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 378 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)). While the agency has considerable discretion in determining on what information to rely, "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Id.*

---

[5] The parties have not disputed that major federal action remained to occur with respect to the Fishel, McCaslin and Northwest Howell projects.

There is no indication in this record that the agency considered any relevant factors at all or made any reasoned decision based on its evaluation of the new information set forth in the Fishel "formal proposal": the agency simply committed to follow its Forest Plan in the future and deferred consideration of the cumulative impacts of McCaslin, Northwest Howell, and Fishel to the Fishel EIS. Finding such statements sufficient to satisfy the agency's hard look obligation is inconsistent with *Marsh* (where deference was found to be appropriate because the decision whether to supplement is based on "substantial agency expertise"), 490 U.S. at 376, and the decisions of numerous courts of appeals. *See, e.g.*, *Natural Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 561-62 (2d Cir. 2009) (upholding an agency's decision not to supplement because it had taken a hard look at new circumstances and analyzed scientific information relating to the ivory-billed woodpecker); *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 13 (1st Cir. 2008) (upholding an agency's decision not to supplement where the agency "ha[d] not ignored [certain environmental] concerns" and "decided to evaluate the issue fully . . . alongside agencies with relevant expertise"); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 445 (4th Cir. 1996) (concluding that an agency had not taken enough of a hard look when it chose not to supplement an EIS without "giv[ing] careful scientific scrutiny to the new information and explain[ing] why the new information did not require the preparation of a supplemental EIS"); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 529-30 (9th Cir. 1994) (upholding an agency's decision not to

supplement where the agency took a hard look, relying on "substantial technical expertise possessed by two federal agencies charged with responsibility for the respective sectors of the affected environment").

In short, I would agree that deference to the agency was appropriate had the agency taken the requisite hard look and determined that no supplementation was required. But I find no indication in the record that any look—hard or otherwise—was taken. I see only a decision to defer consideration of the cumulative impacts of the three projects to the cumulative impacts analysis of the future Fishel EIS. For this reason, I respectfully dissent.